IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs October 22, 2024

## STATE OF TENNESSEE v. ASHLEY LEDFORD AND BRANDON STEPP

**Appeal from the Criminal Court for Campbell County**
**Nos. 18180A, 18180B        Ryan M. Spitzer, Judge**

_____

## No. E2023-01455-CCA-R3-CD

_____

Defendants, Ashley Ledford and Brandon Stepp, were convicted by a Campbell County jury of two counts of aggravated child abuse and neglect of a child under the age of eight resulting in serious bodily injury. The trial court imposed effective twenty-one-year sentences for each Defendant. On appeal, Defendants argue that the evidence was insufficient to support their convictions, that the trial court erred by admitting the victim's out-of-court statements and by consolidating Defendants' cases, and that the trial court abused its discretion in sentencing Defendants. Defendants also assert that they are entitled to relief under the cumulative error doctrine. Upon our review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Jordan Long, Tazewell, Tennessee (on appeal), and Brian Sableman, Oneida, Tennessee (at trial), for the appellant, Ashley Ledford

Andrew Crawford, Knoxville, Tennessee, for the appellant, Brandon Stepp.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Jared Effler, District Attorney General; and Andrea Bridges, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case stems from the abuse of the then seven-year-old victim, H.I.,[1] between December 20, 2017, and February 8, 2018, by her father, Defendant Stepp, and her father's girlfriend, Defendant Ledford. On April 17, 2019, Defendants were indicted jointly for two counts of aggravated child abuse and neglect of a child eight years of age or less resulting in serious bodily injury (counts one and two) and one count of aggravated child abuse and neglect of a child eight years of age or less that was especially heinous, atrocious, cruel, or involved the infliction of torture (count three). Count one charged serious bodily injury "based on the severe bruising and injuries," and count two charged serious bodily injury "based on the bruising of the eye and head contusion[.]"

*Pretrial*

On February 23, 2022, the State filed motions in limine to admit H.I.'s statements to D.S. [2] on January 9, 2018, and to Paramedic Samantha Mundy on February 8, 2018, arguing that the statements were admissible under Tennessee Rules of Evidence 803(3) and 803(4), respectively. In the statements at issue, H.I. identified Defendant Ledford as the person who hit her and said Defendant Stepp was aware of the abuse.

On April 19, 2022, the trial court conducted a hearing on pretrial matters. At the beginning of the hearing, the trial court stated that some of the issues had been dealt with in chambers and requested one of the parties to summarize what was discussed. Regarding H.I.'s statements to D.S. in January 2018, the State explained that:

> And what the [c]ourt ruled was that yes, [H.I.'s] statements to [D.S.] and Pam Jeffries on or about January 9th, 2018, were admissible as long as neither . . . could say who the child identified as causing her to feel this way.
>
> [T]hose statements were that she received whoopings for wetting the bed, she gets whooped with the use of a hand, belt and switch, she gets slapped in the face, and she gets hit in the face when she moves while getting a whooping. And the [c]ourt said as long as the witnesses did not say those

---

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify them by their initials. At the time of trial, H.I. had different initials. We will use her initials at the time of offense and as used in the indictment.

[2] At the time of the offenses, D.S. was H.I.'s teacher. D.S. later adopted H.I. To further protect H.I.'s identity, we will refer to her adoptive parents by their initials.

things happened at the hands of either defendant, then it was admissible as her existing mental, emotional or physical condition.

Following the summary of the court's ruling in chambers, Defendant Ledford argued that H.I.'s statements to D.S. were inadmissible hearsay and that the hearsay exception for then existing state of mind could not be used "to prove a third party's conduct, it's only the declarant's conduct." The trial court stood by its earlier ruling and explained that H.I. was "telling someone at school that [she was] being whatever. That would be the basis for - - I will allow that because it's in a setting without identification of who did it." The trial court noted that without H.I.'s statements the trial would start "without any kind of preliminary background on . . . where the suspicions arose[.]" Defendant Ledford requested clarification regarding whether H.I.'s entire statements would be admissible and argued that "we're talking about the effects on the listeners[.] . . . If the disclosure of physical abuse had the effect of causing them to further the investigation, they only needed to have heard whoopings, not . . . all the specific detail[s.]" The court reiterated that the statements, without H.I.'s identification of Defendant Ledford, would be admissible.

The trial court then heard testimony regarding H.I.'s statements to Paramedic Samantha Mundy. Ms. Mundy testified that as a paramedic, she performed "total patient care" until the patient arrived at the hospital, including obtaining information regarding "[h]istory of physical, allergies, medications, basically anything that [the] ER would need" which is usually provided by the patient or the patient's family members. Ms. Mundy had been trained that when taking a child's statement, to ask non-leading questions and to "state the facts and the facts only, and anything they say, we're supposed to put in quotations in our reports and exactly what they said." Ms. Mundy was "state mandated" to report any suspected abuse or neglect.

On February 8, 2018, Ms. Mundy responded to an "unusual" call to care for H.I. She explained that a doctor had asked emergency personnel to check on H.I. because he had referred H.I. to the hospital, and she had not arrived. Emergency personnel were dispatched to H.I.'s home, and when Ms. Mundy arrived, H.I. and Defendant Stepp were standing on the corner. Ms. Mundy "knew immediately something was not right" because H.I. had a "huge bruise, [and] her eye was swollen." Defendant Stepp claimed that he did not know what had happened to H.I.'s face and that she "just woke up that way." He explained that H.I. had been referred to the hospital earlier that day for a sinus infection. Ms. Mundy was "more concerned" about H.I.'s having a head injury because her injuries "did not appear to be a sinus infection, with a large knot on her head, a black eye that was swollen, [and] greenish brown bruises." Ms. Mundy asked Defendant Stepp to ride in the front of the ambulance because she "felt like something was off[.]" Ms. Mundy rode in the back of the ambulance with H.I.

In the ambulance, Ms. Mundy asked H.I. what happened to her eye and head, and H.I. responded that she "just woke up like that this morning." H.I. told Ms. Mundy that she needed to use the bathroom, so Ms. Mundy told the driver to stop at a McDonald's, and she took H.I. to the bathroom. When they were back in the ambulance, Ms. Mundy again asked:

> what happened to your eye, and I said, you know, it's just me and you back here, if someone is hurting you or if anything is happening, it's okay to tell, and she said oh, my dad knows, but he doesn't make her stop. . . . And I said, . . . who hurt you, who did this to your eye, and she said [Defendant Ledford] whooped her, and I said, well, does she whoop you on your butt or where does she whoop you, she said on my eye or pointed to her face. I'm not sure if she said it or pointed. And I said, did - - how did - - what did she hit you with, she said, her hand, and I said, she hit you like this or (indicating), and then she pointed at my fist[.]

Ms. Mundy explained that whether H.I. was hit with an open hand or a closed fist would affect her treatment because a closed fist could cause more severe injuries. Ms. Mundy asked H.I. why Defendant Ledford hit her, and H.I. said: "because I peed the bed[.]" Ms. Mundy told H.I. to tell a trusted adult if it happened again, and H.I. said: "well, my dad knows and he doesn't make her stop." H.I. then "got super nervous" and asked who Ms. Mundy would tell and what information Ms. Mundy would disclose. Ms. Mundy told H.I. not to worry and they "joked around and talked the rest of the way" because she did not want to "push" H.I. anymore.

When they arrived at the hospital, Ms. Mundy relayed the information H.I. gave her to Dr. Michael Riker, case manager Delilah Miller of the Department of Children's Services ("DCS") child protective services, a social worker, a nurse, and an officer with LaFollette police department. Ms. Mundy confirmed that she authored a report the same evening that she spoke with H.I.; the report was exhibited to her testimony.

On cross-examination by Defendant Ledford, Ms. Mundy affirmed that she "had ruled out a minor slap to the head" because H.I. had been dizzy, had almost vomited, and had a knot on her head. When asked whether she had received "advice . . . about asking the same question expecting a different answer[,]" Ms. Mundy explained that she "just wanted to know medically what was going on and what happened to [H.I.]" She pointed to H.I.'s head and asked whether Defendant Ledford caused that injury to "clarify that this is not just a spanking[.]" Ms. Mundy agreed that knowing the perpetrator of the offense was not relevant to her diagnosis or treatment. Ms. Mundy denied that H.I.'s description of what occurred was consistent with accidental injuries.

On cross-examination by Defendant Stepp, Ms. Mundy explained that the doctor wanted emergency personnel to conduct a welfare check but she could not recall whether the doctor mentioned suspicions of abuse; she did not recall suspecting abuse before she arrived at the residence. She stated that she would have allowed Defendant Stepp to ride in the back of the ambulance had H.I. asked for him.

On February 8, 2018, Dr. Michael Riker was working at East Tennessee Children's Hospital ("ETCH") in Knoxville as a pediatric emergency medicine doctor and treated H.I. He recalled that it was "suggested" to him that H.I. was there "for evaluation of swelling secondary to a sinus infection[.]" In his medical opinion, H.I.'s injuries were inconsistent with a sinus infection. Dr. Riker explained that it was "[a]bsolutely" important for him to know of any statements made to paramedics because "at times, the child may only disclose the information to one person." Dr. Riker could not recall whether he spoke to Ms. Mundy directly, but he knew he had received information from the paramedic in H.I.'s case. In Dr. Riker's opinion, the information from Ms. Mundy that H.I. had disclosed being struck was "far more consistent with the injuries that you could see on examination than a sinus infection would ever be." Dr. Riker's job was "not only . . . caring for the physical aspects of a child but in these cases where we're talking about concerns [of] abuse, figuring out . . . can I ensure the safety of a child[.]" While knowing the cause of the injuries would not change his medical diagnosis and treatment, that knowledge does help with the determination of whether the child goes home, and with whom the child goes, to ensure the child's safety.

On cross-examination by Defendant Ledford, Dr. Riker agreed that knowing whether H.I. was slapped or punched would not change his medical diagnosis. On cross-examination by Defendant Stepp, Dr. Riker stated that the "only thing" he recalled Ms. Mundy saying is that H.I. had disclosed being hit; he did not remember Ms. Mundy stating that H.I. identified the perpetrator.

After hearing arguments from the parties, the trial court found that H.I.'s statements to Ms. Mundy were admissible because Ms. Mundy's questioning was "in furtherance of a later diagnosis." *See* Tenn. R. Evid. 803(4) ("Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.").

The parties then briefly discussed the reconsolidation of Defendants' cases. Defendants were indicted in a single indictment. On February 9, 2021, Defendant Ledford filed a motion to sever the cases, which Defendant Stepp joined on April 9, 2021. The State agreed to sever the cases, and an agreed order was entered on July 7, 2021. On November 29, 2021, the State filed a Motion to Rejoin Defendants, arguing that both

Defendants were charged with accountability for each of the offenses and forcing H.I. "to testify twice, once against the only . . . mother she had ever known and once against her father, subjects [H.I.] to unnecessary stress and trauma, essentially revictimizing" H.I. The record does not include an order resolving the State's motion.

However, on February 24, 2022, Defendant Ledford filed a pleading objecting to the reconsolidation of previously severed trials and objecting to continue Defendant Ledford's trial. Defendant Stepp later filed a motion to join Defendant Ledford's objection to the reconsolidation. In the objection, Defendant Ledford asserted that the trial court denied the State's Motion to Rejoin Defendants on February 7, 2022, but then on February 24, 2022, during "a conference in chambers with the prosecutor and the Judge[,] [t]he Judge ruled, *sua sponte*, over counsel's objection that the trials will be re-joined." The record does not contain a transcript or recording of the conference in chambers. However, at the pretrial hearing, the objection to reconsolidation was addressed. The State explained that the original prosecutor had agreed to a severance "based upon some potential *Bruton*[3] issues as well as offers to cooperate by one of the defendants." The trial court stated:

> Well, they are indicted together, the severance was agreed upon rather than litigated. What I have heard leading up to this suggests that it's better to try them together because there is a lot - - and I understand the intertwining. I don't see this being a cohort issue. The proof is such against both - - and I will give jury instructions concerning criminal responsibility, facilitation. There will be - - facilitation would be a lesser included as to both defendants. Criminal responsibility would be a theory as that applies to both defendants. This will be a - - I'm crafting my charge now in a way that each defendant would be tried separately on the evidence against them but jointly in terms of responsibility, weighing, you know - - any relative culpability would be figured in there.

Both Defendants maintained their objections to a joint trial.

*Trial*

At trial, D.S. testified that he was a first grade teacher in Campbell County Schools during the 2017-2018 school year. As a teacher, he was trained to notice signs of abuse from students such as "over apologiz[ing] because they don't want to be in trouble. Sometimes they begin to . . . wet on themselves again."

---

[3] *Bruton v. United States*, 391 U.S. 123, 130-37 (1968) (holding that admission at a joint trial of a non-testifying co-defendant's confession implicating the defendant constituted prejudicial error even though the trial court gave an instruction that the confession could only be used against the co-defendant and must be disregarded with respect to the defendant).

H.I. was moved into D.S.'s classroom late in the fall 2017 semester. He recalled that H.I. "wanted to please" and was "very apologetic" when she was unable to do what was asked of her. H.I. was "dirty" and it did not appear that she was bathed often. She would come in with "bed head" and "would wear the same clothes two and three days in a row and some days, she smelled like urine." D.S. estimated that H.I. smelled like urine "about half the time." D.S. did not know H.I. or Defendants until H.I. was moved into his class; he had become familiar with both Defendants due to the facts of this case, and he identified both Defendants in court.

On January 9, 2018, D.S. was asked by his principal to inquire about bruising the principal had noticed on H.I. that morning. D.S. observed bruises on H.I.'s arm and face and "there was not a place that was visible . . . that [he] could put three or four fingers down and not touch a bruise." When D.S. asked H.I. about the bruises she said, "that she moved around a lot when she got whippings and she had got a lot of whippings through Christmas break." D.S. agreed that it was common for children to have bruises, but he was concerned about H.I.'s bruises because the "sheer amount of bruises and the shape" of H.I.'s bruises were different; he explained that "[s]ome of them had very straight edges[.]" H.I. pulled her sleeves down to cover her arms when D.S. asked about the bruises. D.S. reported the information to the principal, the school resource officer, the school counselor, and DCS.

D.S. became H.I.'s foster parent on February 8, 2018. When H.I. arrived at his home, her left eye was severely swollen and bruised and "her head was swollen from the top of her head on her left side all the way down to her eye. It went . . . from [the] top of her head around her jawline to her eye."

H.I. testified at trial and identified Defendants in court as her parents before she changed her name. H.I. recalled that she liked when she lived with only Defendant Stepp before they moved in with Defendant Ledford "[b]ecause [she] didn't get beat up." At the time of the offenses, H.I. was seven years old and lived at the house of Defendant Ledford's aunt, Wanda Partin, with both Defendants and Defendant Ledford's children. H.I. thought Defendant Ledford initially "liked" H.I., but when H.I. was in the first grade, "apparently, she didn't like me anymore so she started beating me up" and started using "a mad voice."

Defendant Ledford would not allow H.I. to play with the other children and made her stay in her bedroom except to eat "[o]nce or twice" a day and to use the bathroom. Defendant Ledford "would come in [H.I.'s] room and beat [her] up and just take [her] to the kitchen and make [her] eat something disgusting." H.I. did not tell anyone she was hungry because she was "afraid" that she "would just get hit." H.I. affirmed that she wanted to leave her bedroom more often but when she would ask, Defendant Ledford told her "no."

- 7 -

Defendant Ledford "would use her fist, a switch and a belt and sometimes her leg" to hit H.I. "[b]asically everywhere." H.I. stated that Defendant Ledford hit her "[e]very day." Defendant Ledford would go outside to get a switch and hit H.I. "everywhere, but . . . mostly [her] legs." H.I. affirmed that it hurt when Defendant Ledford hit her but could not recall how often it left a mark. Defendant Stepp was in his "bedroom or living room or passing [H.I.'s] room to get something from the kitchen" when Defendant Ledford would hit H.I. H.I. identified photographs of the home showing H.I.'s bedroom directly beside the entrance to the kitchen; the photographs were exhibited to her testimony.

After "Christmas break" during her first grade year, H.I. recalled speaking to a "lady that would come and get [her] and [they] would talk about [her bruises]." There was another woman who checked her bruises physically and photographed them; those photographs were admitted into evidence. The photographs showed large blue bruises on H.I.'s hip, the outside of her other thigh, and on her right cheek. Another photograph showed H.I.'s left eye was blackened and a large green and purple bruise spanned from under her left eye to her ear and hairline.

H.I. recalled a time when she rode in an ambulance because Defendant Ledford and L.L., Defendant Ledford's seven-year-old son, had hurt her. Defendant Ledford had hit her with a belt on her "legs for sure, and [she felt] there was another spot she hit [her]," but H.I. could not recall where. Defendant Ledford caused the injuries to H.I.'s face "[w]ith a fist, probably shoving [her] – hitting [her] down on the floor or a belt, and just punching [her] face." L.L. had also hit H.I. in her face that day. After the ambulance ride, a doctor told H.I. to say that Defendant Ledford caused the injuries so "he could do something about it."

On cross-examination by Defendant Ledford, H.I. agreed that the woman who took photographs of her was Delilah Miller. H.I. explained that a "[w]hooping is when you're in trouble but they still love you, and beating up just means they don't like you and they're hurting you for no reason." H.I. asserted that Defendant Stepp would "whoop" her, and Defendant Ledford would beat her up. H.I. told other people that Defendant Ledford "whoop[ed]" rather than beat her up, "because [she] knew that [Defendant Ledford] would hit [her]" if H.I. told the truth. H.I. agreed that she would have been uncomfortable telling the doctor that Defendant Stepp caused her injuries because he was in the room with her, but she testified that she was not afraid of Defendant Stepp.

On January 12, 2018, Dr. Marymer Patricia Perales, an expert in child abuse pediatrics, worked at ETCH. H.I. was referred to her by Ms. Miller because H.I. had "bruising [on] her face, back, sides, buttocks, legs and arms after father's girlfriend whipped her for peeing the bed." Defendant Stepp was present during Dr. Perales's examination.

Dr. Perales explained that she noted and photographed every injury that she saw on H.I. during her examination even if it would be considered insignificant individually because she considered "the whole picture" when determining if a child had been abused. The photographs taken during Dr. Perales's examination and the accompanying medical records were admitted into evidence. Dr. Perales determined that H.I. had a bald spot on the top of her head due to "stress alopecia." Dr. Perales also noted small cuts or abrasions across H.I.'s abdomen, back, and buttocks.

Dr. Perales noted bruising on H.I.'s forearms. H.I. had a loop lesion bruise on the back of her left forearm and a healed loop lesion on her left hand. Loop lesions are "U"-shaped and "are consistent with inflicted trauma with a looped object such as a cord or a belt." For there to be a scar, there must have been "some breakage of the skin" on H.I.'s hand. Dr. Perales stated that these bruises could be "nonspecific," or they could be defensive wounds from when "the child would put her arms up to protect her face, her chest or her abdomen." Based on the different stages of healing, Dr. Perales determined that the injuries were from "more than one event."

H.I. had "more than likely totally normal kid bruising" along her shins and knees. Dr. Perales documented a "linear" bruise on H.I.'s right thigh. She explained that bruising on the thigh is "less common" because it required "more impact" and that "linear bruises have to have a straight edge component to it[.]" She opined that the linear bruise "would be consistent" with inflicted trauma. There were "multiple different types of bruising" on the back of H.I.'s right thigh. There was a "loop mark" with "an abrasion type of mark in the middle of it as well. And then above it, you see something similar but smaller, so she has two lesions here to the back of her right thigh[.]" H.I. had a "large confluent bruise" on her right hip. Dr. Perales explained that confluent meant that the bruise "expands out, it could be one bruise, or it could be multiple bruises that have kind of enmeshed into one."

On H.I.'s left leg, there was a bruise on the back of her knee, two linear bruises with a "little loop at the end[,]" and a bruise on the side of her buttock. Dr. Perales explained that it was "very hard" to accidentally bruise the back of the knee, and she opined that the linear bruises were caused by a belt or a cord. The bruises on H.I.'s left thigh were caused by "two different strikes[.]" Dr. Perales stated that "this whole leg is very concerning for inflicted trauma."

After completing her examination, Dr. Perales determined that H.I.'s injuries were caused by "repetitive inflicted trauma with a loss of control, and that happens . . . usually with discipline." She informed Defendant Stepp of her findings and advised him that H.I. "should continue to be protected from the alleged perpetrator until the investigation is complete, and that a forensic interview should be done."

- 9 -

Dr. Perales did not see H.I. again after January 12, but she was aware that H.I. had been seen by Dr. Riker on February 8, 2018. Dr. Perales reviewed H.I.'s medical records from February 8, which included a CT scan that showed swelling between H.I.'s scalp and skull, and photographs of H.I. with a black left eye and bruising on the left side of the face. She opined that the bruising on H.I.'s face and the scalp swelling would have been "very painful." Based on H.I.'s medical records, Dr. Perales agreed with Dr. Riker's diagnosis of child abuse.

On cross-examination by Defendant Ledford, Dr. Perales agreed that she did not note bruising on H.I.'s face on January 12. She explained that she used the word "significant" in her notes to describe the bruise on H.I.'s right leg because "[i]t took up almost the entire half of her thigh."

On cross-examination by Defendant Stepp, Dr. Perales stated that there was not a viral illness that would cause H.I.'s injuries. She stated that loop lesions and linear bruises "could be" accidental but in her experience they were not.

Dr. Jeff Mann testified that Defendant Stepp brought H.I. to his office for the first time on January 15, 2018, for intermittent bed wetting. Dr. Mann next saw H.I. on February 8, 2018, because H.I. had "some facial swelling, some scalp swelling, [and] some headache." Defendant Stepp told Dr. Mann that he had once had a sinus infection that presented in a similar manner and that H.I. had been sick. H.I. had "drainage from the left eye and drainage from her nose." Dr. Mann "was most worried" that H.I. had "a smoldering infection" in her sinuses that could spread to her bloodstream and "potentially be fatal." He noted that H.I. had some swelling on the left side of her head but "it wasn't a lot to [him]." Dr. Mann diagnosed H.I. with a sinus infection because an x-ray of H.I.'s sinuses showed that "the left maxillary sinus was pretty well filled up."

Dr. Mann instructed Defendant Stepp to take H.I. to ETCH due to his concerns. Defendant Stepp denied an ambulance transport and said he would use his aunt's car to transport H.I. When Dr. Mann called ETCH a few hours later to check on H.I., ETCH told him that she had not arrived. Dr. Mann then called Defendant Stepp and was told by Defendant Stepp that "the tires on the car aren't good enough to make the trip." Dr. Mann then arranged for an ambulance to transport H.I. from the home to ETCH.

On cross-examination by Defendant Ledford, Dr. Mann stated that he did not notice bruises during H.I.'s visit on January 15, 2018. He stated that he would not have been more likely to provide an alternative diagnosis without Defendant Stepp's suggestion of a sinus infection because H.I. needed to go to ETCH for a more comprehensive examination "whether it was a sinusitis, whether it was something else, at that moment, it didn't really matter."

On cross-examination by Defendant Stepp, Dr. Mann stated that H.I.'s blood work on February 8, 2018, did not indicate any medical reason for H.I. to bruise more easily than normal. He was not surprised that Dr. Riker disagreed with his sinus infection diagnosis because Dr. Riker had conducted a more thorough examination.

On redirect examination, Dr. Mann stated that he did not disagree with a child abuse diagnosis.

On February 8, 2018, Samantha Mundy, a paramedic at Claiborne EMS, received an "unusual" call from Dr. Mann requesting that paramedics go to the home of H.I. to check on her because she was referred to ETCH but had not arrived. Ms. Mundy found this unusual because she would "normally get the call from 911 dispatch[.]" When Ms. Mundy arrived at the residence, she saw H.I. and her father standing on the corner. In court, she identified Defendant Stepp as H.I.'s father. H.I. "was just kind of standing there clinging on to her dad." Ms. Mundy noticed that H.I. "had a huge swollen black eye" and her "left eye was swelled shut and facial bruising all down her cheek area." Defendant Stepp stated that H.I. had "woke up like this" and that H.I. was dizzy and "almost" vomited. Ms. Mundy estimated that the bruising was "three or four days" old. Defendant Stepp provided Ms. Mundy with a report from Dr. Mann indicating that H.I. had a sinus infection. Defendant Stepp stated that he was supposed to bring H.I. to ETCH, but "[h]e did not have a ride and his vehicle tires were too bald to make it to Knoxville. And the other was out of gas."

The paramedics then transported H.I. to ETCH. Ms. Mundy's testimony at trial was consistent with her testimony at the pretrial hearing. H.I. initially denied that anyone caused the injuries and insisted she "just woke up like that, nothing happened." After the bathroom stop at McDonald's, H.I. disclosed that Defendant Ledford hit her, and that Defendant Stepp was aware and did nothing. H.I. also indicated that Defendant Ledford caused her injuries with a closed fist "[b]ecause she peed the bed." Ms. Mundy relayed this information to the nurse, the social worker, and Dr. Riker upon arrival at ETCH and later contacted the LaFollette Police Department.

On February 8, 2018, Dr. Michael Riker, an expert in the field of pediatric emergency medicine, treated H.I. at ETCH. Defendant Stepp told Dr. Riker that H.I. had "woke up yesterday with left eye swelling/bruising which caused [H.I.]'s eye to be completely shut." Defendant Stepp relayed that Dr. Mann diagnosed her with a sinus infection. Dr. Riker "walked in the room . . . to a young lady with facial swelling, and a history kind of presented to [him] that was concerning for intentional abuse." The first thing that Dr. Riker noticed was that H.I. "had a black eye and . . . some facial swelling[.]"

Dr. Riker's examination revealed swelling to the left side of H.I.'s head and a black left eye. Photographs of the injuries were exhibited to his testimony showing a black left eye with swelling and discoloration extending across H.I.'s nose and faint bruising on H.I.'s right cheek. The bruising extended from H.I.'s left eye "back towards the – kind of the cheek kind of an extending back towards the left ear itself." Based on the coloring of the bruises, Dr. Riker opined that the black eye was "newer" than the bruising along the left side of H.I.'s face. While reviewing the photographs at trial, Dr. Riker noted a "subconjunctival hemorrhage" in H.I.'s left eye that he had not noticed during his initial examination of H.I. in 2018. He explained that injury was likely caused by "an injury to this area which probably caused those vessels to rupture[.]"

Because of the bruising to the side of H.I.'s head, Dr. Riker ordered a CT scan, a copy of which was exhibited to his testimony and showed "swelling under the scalp so between the skull and the outer scalp[.]" Dr. Riker described the CT scan as "impressive" because of the "severe" swelling between the skull and the scalp. He opined that the injury was caused by repeated blows or by extended pulling of the hair. Dr. Riker likened that injury to injuries sustained when a child's hair was stuck "in a piece of machinery where it just yanks their hair hard enough and kind of long enough to where you would get kind of separation of those tissues from the scalp away from the underlying tissue and you get a lot of bleeding underneath there." He agreed that either injury would require a "great deal of force" and that it "would be more than a schoolmate just pulling your hair on the playground[.]" Dr. Riker discussed with Defendant Stepp the CT findings and H.I.'s disclosure that Defendant Ledford had caused the injuries. Defendant Stepp stated that "he was completely unaware of any kind of abuse at home and was not aware of any recent events that ha[d] occurred."

Based on his observation and examination of H.I.'s injuries, Dr. Riker determined that H.I.'s injuries were nonaccidental. He disagreed with Dr. Mann's diagnosis of a sinus infection. H.I.'s emergency room medical note included "an additional area where it documents that EMS had indicated that this patient disclosed some information to her on the way to the hospital." He agreed that being struck with a fist could have caused the injuries to H.I.'s face. Dr. Riker agreed that he considered each of H.I.'s injuries "severe[.]"

On cross-examination by Defendant Ledford, Dr. Riker agreed that he did not note any bruising other than on H.I.'s face but explained that he would not have noted every bruise because some bruising is "very normal for children[.]" Dr. Riker denied that H.I.'s black eye could be accidental when considered with her statement that Defendant Ledford caused the injuries. Dr. Riker explained that there was not a medical diagnosis for "severe child abuse" but "a seven-year[-]old girl with . . . swelling to the scalp and bruising to the

eye that can't be explained otherwise, if you want me to say it was severe, I'd say it was severe, but again, that's my medical opinion."

On cross-examination by Defendant Stepp, Dr. Riker agreed that he and Dr. Mann had a difference of opinion regarding whether H.I. had a sinus infection. Dr. Riker stated that a sinus infection would not cause swelling in the areas where H.I. had swelling.

Delilah Miller, a DCS child protective services case manager, was assigned H.I.'s case on January 9, 2018. H.I.'s case came in as "nonsevere abuse." Ms. Miller responded to H.I.'s school on January 10, 2018, and spoke to the assistant principal and school counselor before speaking with H.I. When Ms. Miller asked H.I. about the bruises, H.I. told her that "her stepmother would whip her for peeing in the bed. And she made statements of like she would get spanked, . . . [and] she flailed around like a fish so that's why the bruises were in different places." H.I. explained that "sometimes when [Defendant Ledford] was whipping her that she would accidentally fall down and so, [Defendant Ledford] would have to pick her up with her hair." H.I. said that Defendant Ledford would hit her with a belt, her hand, and a switch. Ms. Miller took a photograph of "line marks" on H.I.'s cheek which, based on her training, appeared to be markings from a slap. Photographs Ms. Miller had taken showed bruises above H.I.'s right eyebrow, on her back, and on her arms. After speaking with H.I. and observing her injuries, Ms. Miller decided that this was a case of severe abuse and initiated a Child Protective Investigative Team ("CPIT") which consisted of DCS, law enforcement, a mental health provider, and the District Attorney's office.

After leaving the school, Ms. Miller conducted a home visit. Because the house was "really chaotic" she asked Defendants to meet her at the Lafollette Police Department for interviews. She identified both Defendants in court. Ms. Miller interviewed Defendants separately. Defendant Stepp told her that H.I. "was having a problem peeing the bed," that "she was clumsy, and he hadn't noticed anything wrong with her." Defendant Stepp told her that he worked 10:00 a.m. to 6:00 p.m. five days a week, and he had given Defendant Ledford permission to "whoop" H.I. Defendant Stepp stated that he had given H.I. a bath the night before and had not noticed any bruises on H.I. Defendant Ledford told Ms. Miller that she felt H.I. was wetting the bed "on purpose." She stated that H.I. was "clumsy" and "rough." Defendant Ledford claimed to have noticed bruises on H.I. when she bathed her the night before.

Ms. Miller described the environment in the lobby as "hostile" when she entered after completing the interviews. She noted Defendant Stepp speaking with H.I., and Ms. Miller informed him that he could not interfere with the investigation. Defendant Stepp told her "that she was his daughter and he was gonna talk to her about whatever he wanted to talk to her about." Ms. Miller attempted to schedule a forensic interview for the

following day, but Defendant Stepp failed to respond to Ms. Miller to schedule the interview.

On January 12, 2018, Ms. Miller brought H.I. to ETCH to be examined by Dr. Perales. Ms. Miller was present during the exam and heard Defendant Stepp acknowledge Dr. Perales's finding of abuse.

On February 8, 2018, Ms. Miller responded to ETCH. When she arrived, Defendant Stepp told her the family had the flu the week prior, that H.I. had "woke up one morning and her eye was like all bruised and swollen[,]" and Dr. Mann had diagnosed her with a sinus infection. Defendant Stepp told her that he was instructed to bring H.I. to the hospital but his car could not make the drive. H.I. was placed in D.S.'s care upon her release from ETCH. Ms. Miller assumed that Defendant Stepp did not have transportation back to LaFollette because he rode in the ambulance to ETCH so she offered to drive Defendant Stepp to LaFollette. Defendant Stepp declined the offer because Ms. Partin was waiting in the parking lot for him.

On cross-examination by Defendant Ledford, Ms. Miller acknowledged that at times "some things [in H.I.'s story] have changed depending on who was around and how safe she felt." She also acknowledged that some information indicated that the injuries might have been caused by someone other than Defendant Ledford.

On cross-examination by Defendant Stepp, Ms. Miller acknowledged that H.I. participated in two forensic interviews, one in February and the other in April. H.I. did not disclose abuse during the first forensic interview, and in the second forensic interview, H.I. stated that Defendant Stepp was unaware of the abuse.

On redirect examination, Ms. Miller explained that H.I. disclosed abuse by Defendant Ledford during the second forensic interview and that the CPIT recommended prosecution in February 2018.

On recross-examination by Defendant Ledford, Ms. Miller acknowledged multiple inconsistencies between H.I.'s statements during the forensic interviews and her preliminary hearing testimony regarding the cause of her injuries.

The State then rested its case. The trial court granted both Defendants' motions for judgment of acquittal for count three. Neither Defendant testified, and Defendant Stepp presented no proof.

Wanda Partin, Defendant Ledford's aunt, testified that H.I. had "a good life" in her home and that she and Defendants took care of H.I. the best they knew how. Ms. Partin

- 14 -

stated that after Defendant Ledford gave birth to her youngest child, H.I. became jealous and "acted out." H.I. would frequently wet the bed, and Defendant Stepp would discipline her for it. Defendant Stepp would take H.I. to his bedroom and close the door to discipline her.

Ms. Partin described H.I. as "clumsy" and recalled a time when H.I. fell off a picnic table while playing with her cousins. Defendant Stepp refused to check on H.I. after she fell. Defendant Ledford "got mad at" H.I. because "she was told several times to get off the picnic table." Defendant Ledford "tapped her on the butt" when H.I. refused to listen to her. She affirmed that this was how Defendant Ledford would typically discipline H.I.

In February 2018, H.I. had been sick for "two or three days." When H.I. woke up she told Ms. Partin that she could not open her eye. Ms. Partin observed that "her eye was so matted with infection that she couldn't open her eye," and the bridge of her nose, eye, and face were swollen. Ms. Partin wet a rag with warm water and rubbed "a whole lot of infection out of" H.I.'s eye until it would open. There was a small knot about the size of a quarter on H.I.'s head. Ms. Partin told Defendant Ledford to look at H.I., and both women told Defendant Stepp that H.I. needed to be taken to the doctor. Defendant Stepp refused because H.I. did not have health insurance. Ms. Partin explained that she and Defendant Ledford could not take H.I. because neither was her legal guardian. Ms. Partin denied that her car was unable to make the trip to ETCH.

L.L., one of Defendant Ledford's children, testified that he and H.I. would "slap, kick, . . . [and] punch" each other when they played. He stated that Defendant Stepp was the only one who disciplined H.I., and that Defendant Stepp used Defendant Ledford's belt to hit H.I. L.L. was "scared [and] nervous" the week that H.I. had the black eye because he thought she would lose her eye. He recalled that Defendant Stepp told "everybody that she didn't have insurance so he couldn't take her to the doctor." L.L. denied causing H.I.'s bruises in January.

On cross-examination by the State, L.L. stated that he caused the bruises on H.I.'s legs by "[h]itting her." On cross-examination by Defendant Stepp, L.L. denied knowing how H.I. received the black eye and stated that she "just woke up like that."

Mary Gina Bolton testified that she stayed with Ms. Partin and Defendants for one week each in January and February 2018. Ms. Bolton stated that she did not see any bruises on H.I. in January other than one on H.I.'s thigh that was caused by a tire swing. Regarding the February incident, Ms. Bolton stated that H.I.'s eye was "swollen real bad" but not "bruised."

- 15 -

Based on this proof, the jury convicted both Defendants of two counts of aggravated child abuse as charged in the indictment.

*Sentencing*

The trial court conducted a sentencing hearing on June 29, 2022. Presentence reports for both Defendants were entered into evidence. According to Defendant Ledford's presentence report, she had no prior criminal history but had a pending assault charge in Campbell County. In her version of events, Defendant Ledford stated that she respected the jury's verdict. She regretted "losing control" when disciplining H.I. and regretted that she would not be able to raise her three other children. Defendant Ledford felt "awful" about what happened to H.I. and "should've protected [H.I.] and been a better mother to [H.I.]" Defendant Ledford reported that she dropped out of high school in the ninth grade because she was pregnant with her first child. She reported no mental or physical health conditions, and no history of drug abuse. Defendant Stepp's presentence report listed three prior misdemeanor convictions. Defendant Stepp reported dropping out of high school and had not obtained his GED. He denied having any mental or physical health problems.

J.S., H.I.'s adoptive mother, testified and read a portion of her victim impact statement to the court, which was exhibited to her testimony. H.I. was placed in her home when she was released from ETCH in February 2018. Because of the abuse, H.I. suffered from PTSD, separation anxiety, general anxiety, and was "hyper[-]vigilant when in public places." H.I. attended behavioral therapy, speech therapy, occupational therapy, and physical therapy for three years but at the time of sentencing only attended behavioral therapy. J.S. explained that H.I. had to be taught "basic tasks that most toddlers know." She requested the maximum sentence with full incarceration because neither of the Defendants "showed any signs of remorse for their behavior until they were proclaimed guilty." She thought Defendant Stepp would like to know that H.I. still loved him but was "very, very disappointed in him that he didn't stop the abuse when he knew about it. [H.I.] said that he would walk by, and she said, I felt like no more than a dog just waiting to be petted."

D.S. testified that H.I. "still struggles mightily with fear." During the trial, H.I. asked "how did my daddy react, was my daddy sad when he was served? When we adopted her, did he cry, was he upset?" D.S. "couldn't keep from crying" during trial because "there was no reaction on [Defendants'] part of sadness or remorse." He expressed his hope that the sentence would reflect "that there [was] absolutely no remorse[.]" On cross-examination by Defendant Ledford's attorney, D.S. agreed that he witnessed Defendant Ledford "crying for herself" after the verdict was announced.

Defendant Ledford's younger sister, Stephanie Partin, and her biological mother, Vanessa Dumont, testified on her behalf. Both women stated that Defendant Ledford had helped raise her five younger siblings and was a good mother to her own children. Stephanie Partin explained that Defendant Ledford had watched her two children for almost a decade prior to being incarcerated in this case in exchange for only $40 a week. Ms. Dumont requested that the trial court "go light on [Defendant Ledford] because you all really don't know the truth."

After hearing arguments of the parties, the trial court found that Defendants had abused a position of private trust. *See* T.C.A. § 40-35-114(14).

> . . . . I can't speak enough about how we as parents or as adults are responsible for the care of a child – are responsible from the beginning to the end. There is no, oh, I had a bad day, or I had a bad week. We don't get to have a bad week. . . . . [T]hat's not a luxury and we don't get do overs, and we don't get excuses because that's all that they are. We're not perfect. Parents are not perfect, none of us are. But, understanding that we have a continued active role in taking care of young children is the most important thing an adult can do when you . . . engage in that process. If you're going to be in a child rearing role, then you've got to take it serious every day, every hour. That's what . . . the private trust is. When you engage in parenting, you are saying, I can be trusted to do the right thing by my child over the . . . interest of myself. In this particular case, on both defendants, . . . and I will agree with [counsel for Defendant Ledford] . . . that [Defendant] Ledford in her PSI was remorseful. . . . Doesn't matter, not really. That child is still hurt and that child is still damaged, and the child has got a lot of growth to get through. And we just don't get to do that. We just don't get to say, gosh, oh, I really wish I had done it different. Sometimes it's all we can say, but we're still left to clean up what we've done or what we failed to do, and that enhancement factor will be given great weight.

The trial court also found that Defendant Stepp's criminal history was an enhancement factor and that Defendant Ledford's lack of criminal history was a mitigating factor. The trial court noted that Defendant Stepp was H.I.'s biological father and "when something is in front of you and you fail to recognize it, or you fail to act upon it, that is of the utmost neglect that one can do to another human being." The trial court found no mitigating factors for Defendant Stepp.

The trial court imposed Range I concurrent sentences of twenty-one years for counts one and two for both Defendants. The trial court later filed a Sentencing Findings of Fact for both Defendants memorializing its oral findings.

Defendants filed timely motions for new trial, which were denied following the hearing on May 4, 2023. Written orders denying the motions were entered on August 16, 2023. On October 16, 2023, Defendant Ledford filed a Motion for Findings of Fact and Conclusions of Law. She then filed a notice of appeal on October 24, 2023, which was amended on November 3, 2023. This court granted Defendant Ledford's motion to waive the timely filing requirement. *State v. Ledford*, No. E2023-01455-CCA-MR3-CD (Tenn. Crim. App. Oct. 24, 2023) (order). On November 16, 2023, the trial court entered an amended order denying Defendants' motions for new trial, which included citations to an attached transcript of the May 4, 2023 hearing on the motions for new trial.[4] Defendant Stepp subsequently filed his notice of appeal on December 4, 2023.

**Analysis**

I. <u>Defendant Stepp's Untimely Notice of Appeal</u>

As an initial matter, we must address Defendant Stepp's untimely notice of appeal. Both Defendants filed timely motions for new trial, which were denied via written order on August 16, 2023. Thus, the time period for a timely notice of appeal expired on September 15, 2023. *See* Tenn. R. App. P. 4(a) (stating that a notice of appeal as of right "shall be filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from"). This court granted Defendant Ledford's motion to waive the timely filing of the notice of appeal. Defendant Stepp filed his untimely notice of appeal on December 4, 2023, and filed no motion seeking relief.

Generally, "a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed. Once a judgment becomes final or a timely notice of appeal has been filed, the trial court loses jurisdiction over the matter." *State v. Boyd*, 51 S.W.3d 206, 210 (Tenn. Crim. App. 2000) (citing *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996); Tenn. R. App. P. 4(a), (c)); *State v. Bullock*, No. E2021-00661-CCA-R3-CD, 2022 WL 3012460, at *3 (Tenn. Crim. App. July 29, 2022) (concluding that the notice of appeal was untimely because the trial court lacked jurisdiction to enter an amended order denying motion for new trial more than thirty days after the original was filed and no intervening motions were filed). We acknowledge that Defendant Stepp's notice of appeal was filed within thirty days of the trial court's November 16, 2023 amended order. However, the trial court no longer had jurisdiction to

---

[4] The transcript attached to and incorporated in the amended order is marked as a "copy," but it is not a copy of the transcript from the motion for new trial included in the official record. It was transcribed by a different court reporter and is not a verbatim transcript of the proceedings, and is organized by issues raised in Defendants' motions for new trial. We view it solely as part of the trial court's findings and not as a transcript of the proceedings.

enter the amended order three months after entry of its initial order denying the motions for new trial. Thus, Defendant Stepp's notice of appeal was untimely.

Because a timely notice of appeal is not jurisdictional, this court may waive this requirement in the interest of justice after considering "the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (quoting *State v. Broyld*, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415 (Tenn. Crim. App. Dec. 27, 2005)). Defendant Stepp neither sought relief to file his untimely appeal nor did he file a reply brief in response to the State's brief requesting that this court dismiss the appeal as untimely. Thus, he has shown no reason for the delay in seeking relief. However, apart from his challenge to the sufficiency of the evidence for count two, Defendant Stepp either expressly "adopts and incorporates by reference" Defendant Ledford's arguments or presents virtually identical legal arguments. Because Defendant Ledford's appeal is properly before this court, and because of the similarity of the issues and the severity of the offenses, in the interest of justice, we will waive the timely filing and address the merits of Defendant Stepp's issues.

## II. Admission of H.I.'s Hearsay Statements[5]

Defendants assert that the trial court erred by admitting H.I.'s out-of-court statements to D.S. and Ms. Mundy, and that D.S.'s testimony regarding H.I.'s statements violated their right to confront witnesses against them. The State responds that the trial court properly admitted the statements to Ms. Mundy because they were made for the purposes of medical diagnosis and treatment, that the statements to D.S. were properly admitted because they were statements of H.I.'s then existing mental, emotional, or physical condition, and that Defendants' confrontation clause argument is waived. We agree with the State.

Hearsay is an out of court statement offered in court for the truth of the matter asserted. Tenn. R. Evid. 801(c). Hearsay is inherently unreliable and inadmissible unless it fits into one of the exceptions. Tenn. R. Evid. 802; *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012). Our supreme court has explained:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these

---

[5] We have combined Defendants' issues one and two for conciseness. Defendant Stepp "incorporates and adopts" Defendant Ledford's arguments regarding H.I.'s statements.

questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d [739, 759-61 (Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). A trial court's decision regarding the admissibility of admissible hearsay on other grounds is reviewed for abuse of discretion. *Id.* "Whether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law. The proper application of that law to the trial court's factual findings is likewise a question of law, subject to de novo review." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citations omitted).

**Statements to D.S.**

Defendants assert that H.I.'s January 9, 2018 statements to D.S. that her bruises were caused by various means of being hit were inadmissible under Tennessee Rule of Evidence 803(3) because they were used to prove a third party's conduct. Additionally, Defendants argue that admission of the statements violated their rights under the confrontation clause. In their motions for new trial, both Defendants challenged the trial court's admission of H.I.'s statements to D.S. on hearsay grounds. However, neither Defendant challenged the admission as a violation of their rights under the confrontation clause. Thus, Defendants have waived this challenge because "[a]n appellant cannot raise an issue for the first time on appeal[.]" *State v. Avila-Salazar*, No. M2023-01649-CCA-R3-CD, 2024 WL 3738647, at *2 (Tenn. Crim. App. Aug. 9, 2024) (quoting *State v. Hardison*, 680 S.W.3d 282, 309 (Tenn. Crim. App. 2023)), *perm. app. filed*; Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). "Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *4 (Tenn. Crim. App. Nov. 9, 2023) (quoting *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*), *perm. app. denied* (Tenn. May 16, 2024). Neither Defendant responded to the State's waiver argument. Further, we find no

particularly compelling or egregious circumstances to justify our sua sponte review because H.I. testified, which provided Defendants an opportunity to question her regarding her statements.

Turning to Defendants' properly preserved challenge to the admissibility of H.I.'s statements to D.S., Tennessee Rule of Evidence 803(3) allows admission of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition[.]" This exception may not be used to prove a third party's conduct. *Id.* Advisory Comm'n Comments. Here, D.S. testified that H.I. told him she had bruises because "she moved around a lot when she got whippings and she had got a lot of whippings through Christmas break." While it is true that H.I.'s statement that she "got whippings" would necessarily mean that a third party hit her, the trial court found that the purpose of H.I.'s statements was to explain her then existing physical condition of having numerous bruises, rather than to prove the third party's conduct and the trial court ruled that D.S. could not testify about H.I.'s identification of the person who caused the bruises.

Defendants rely on *State v. Ramos* to support their contention that H.I.'s statements were admitted to prove a third party's conduct. 331 S.W.3d 408, 415 (Tenn. Crim. App. 2010). In *Ramos*, the victim stated to her mother that "[the defendant] touch me here; it hurts." *Id.* at 414. This court upheld the trial court's admission of the statement under the excited utterance exception. *Id.* at 415. This court further noted that a portion of the statement, "it hurts," was admissible as a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition. *Id.* However, the portion of the statement identifying the defendant was inadmissible because it identified a third party's conduct. *Id.* Here, distinct from the victim in *Ramos*, H.I.'s statement did not identify either Defendant as the perpetrator. Further, the excluded portion of the statement in *Ramos* did not prove anything other than the defendant's conduct whereas H.I.'s statement proved *how* H.I. received the bruises to explain her current physical state, not *who* caused the bruises. Because H.I.'s statements were admitted to prove her then existing physical condition of having multiple bruises, the trial court did not err in admitting the statements. Defendants are not entitled to relief.

**Statements to Ms. Mundy**

Defendants argue that the trial court erred by admitting H.I.'s statements to Ms. Mundy under Tennessee Rule of Evidence 803(4) because the statements were improperly influenced by Ms. Mundy's questioning. The State argues that the statements were properly admitted as statements for the purposes of medical diagnosis and treatment and that the record does not suggest that H.I.'s statements were untrustworthy or that Ms. Mundy's questions were improper.

Tennessee Rule of Evidence 803(4) allows admission of statements "made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Further, "[a] statement regarding the general character, cause, or source of the problem is also admissible if . . . such statement is reasonably pertinent to diagnosis and treatment." *State v Stinnett*, 958 S.W.2d 329, 332 (Tenn. 1997) (citing *State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996)). Trial courts should consider the totality of the circumstances when determining whether a child's statement to a medical provider falls within this exception. *Id.* "A statement improperly influenced by another [or] one made in response to suggestive or leading questions . . . deserves especially careful scrutiny because such statement may have been made for purposes other than diagnosis and treatment." *Id.*

On appeal, Defendants do not challenge that the statements were admissible as statements made for medical diagnosis. Rather, Defendants assert that Ms. Mundy's questioning of H.I. was suggestive because asking "the same question multiple times to a child who wants to please is suggestive to the child that they are giving the wrong answer." Defendants note that Ms. Mundy used leading questions when asking whether Defendant Ledford used an open hand or a fist.

Ms. Mundy testified that she was trained to not ask leading questions when taking statements from child patients. Ms. Mundy explained that while in the ambulance on the way to ETCH she asked H.I. what happened to her face because H.I.'s injuries were inconsistent with the reported sinus infection, and for treatment purposes, it was important to know how H.I. was injured. At first, H.I. responded that she "woke up like that." After a bathroom break, Ms. Mundy asked H.I. again what happened to her face, and H.I. disclosed that Defendant Ledford hit her. Ms. Mundy then followed up on the visible injuries to H.I.'s face asking if Defendant Ledford caused those injuries and H.I. responded affirmatively. H.I. further told Ms. Mundy that Defendant Ledford hit her for wetting the bed and that Defendant Stepp knew Defendant Ledford hit H.I. but did not stop her. When Ms. Mundy followed up on how Defendant Ledford hit H.I. by showing her an open hand and a closed fist, H.I. pointed to Ms. Mundy's fist. Ms. Mundy explained that knowing whether H.I. was hit with a fist or an open hand was important for medical treatment because a fist would cause more significant injuries and require further medical evaluation. Dr. Riker also testified that knowing the cause of a child's injuries was important to determine how to treat and protect the child, which was an essential part of his job.

There is no evidence that Ms. Mundy's questioning influenced H.I.'s responses or that H.I. was motivated to be untruthful. Further, Defendants had the opportunity to cross-examine H.I. on her statements to Ms. Mundy. The trial court did not abuse its discretion in admitting the statements. Defendants are not entitled to relief.

- 22 -

### III.    Consolidation of Defendants

Both Defendants assert that the trial court erred in reconsolidating their cases for trial.  The State argues that the record is insufficient for this court's review, and in the alternative, that the trial court did not err in reconsolidating the cases because judicial economy and efficiency supported a single trial. We agree with the State that the trial court did not err in consolidating the cases.

The State asserts that the record is inadequate for our review of this issue because it does not "include a transcript of this discussion in the trial court's chambers or the trial court's ruling on the decision to re-join."  It is the duty of the appellant to provide a record that conveys "a fair, accurate and complete account of what transpired with respect to" the issues on appeal.  Tenn. R. App. P. 24(b).  It is clear from the record that the trial court made some rulings in chambers without creating a record of those discussions.  This court has repeatedly cautioned against off-the-record discussions "concerning matters of significance in criminal proceedings because such discussions may preclude appropriate appellate review."  *State v. Bolden*, No. W2022-01127-CCA-R3-CD, 2024 WL 466168, at *21 (Tenn. Crim. App. Feb. 7, 2024) (citing *State v. Byrd*, No. E2013-00365-CCA-R3-CD, 2014 WL 545451, at *4 (Tenn. Crim. App. Feb. 10, 2014)), *perm. app. denied* (Tenn. Sept. 12, 2024).

While the record does not include a transcript of the matters handled in chambers, Defendant Ledford's written objection to reconsolidation asserts that the trial court denied the State's motion to reconsolidate on February 7, 2022, and then reconsolidated the cases during the conference in chambers on February 24, 2022.  None of the parties contest Defendant Ledford's recitation of these facts as set out in the motion.  Further, at the pretrial hearing on April 19, 2022, a transcript of which is included in the record, the trial court addressed Defendants' objections to reconsolidation and discussed its decision on the record.  The parties agreed that "severance was by agreement early on" based on potential *Bruton* issues and offers of cooperation by one of the defendants.  The State announced that those matters were no longer an issue and the trial court responded by stating that "they are indicted together, the severance was agreed upon rather than litigated" and "it's better to try them together because there is a lot - - and I understand the intertwining[,]" that the proof would be the same against both defendants, and that the jury would be properly instructed to decide the case against each defendant separately.  Certainly, the trial court should have either had the discussion in chambers recorded and transcribed or have held the discussion in open court.  However, because the issue was addressed on the record at the pretrial hearing, we find the record adequate for our review of this issue.

"Joint trials of defendants charged in the same indictment are favored because they promote efficiency and reduce the possibility of inconsistent verdicts."  *State v. Harbison*,

539 S.W.3d 149, 158 (Tenn. 2018); Tenn. R. Crim. P. 8, Advisory Comm'n Comment ("Permissive joinder of defendants . . . is aimed at achieving improved judicial economy and efficiency.") Tennessee Rule of Criminal Procedure 13 "allows at the court's option the consolidation or severance of offenses or defendants in those instances in which the state or the defendant could have elected to consolidate or sever." Tenn. R. Crim. P. 13, Advisory Comm'n Comment. Because a defendant's "objection to consolidation ha[s] the same procedural and substantive effect as a formal motion to sever[,]" this court will review a trial court's order to consolidate over a defendant's objection as a denial of severance. *State v. Spicer*, 12 S.W.3d 438, 444 (Tenn. 2000) ("We hold, therefore, that irrespective of whether a defendant formally moves for severance or whether a defendant merely objects to the state's pre-trial motion for consolidation, the issue properly preserved is one of severance.").

A trial court shall grant a severance of defendants if "before trial, the court finds a severance . . . appropriate to promote a fair determination of the guilt or innocence of one or more defendants[.]" Tenn. R. Crim. P. 14(c)(2).[6] Our supreme court has explained:

> There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant.

*Harbison*, 539 S.W.3d at 159.

Mutually antagonistic defenses are not prejudicial per se, and "few cases have been reversed on this ground due to the difficulty in establishing prejudice." *Harbison*, 539 S.W.3d at 160. Further, "[m]ere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic." *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996). To show prejudice based on mutually antagonistic defenses, a defendant must "establish that a joint trial will result in 'compelling prejudice,' against which the trial court cannot protect, so that a fair trial

---

[6] We note that a defendant may also move for severance based on a co-defendant's out-of-court statement that implicates the defendant. Tenn. R. Crim. P. 14(c)(1). However, neither party raises this as a potential issue and the record reflects that no out-of-court statements from either Defendant implicating the other were admitted.

cannot be had." *Id.* (quoting *State v. Farmer*, No. 03C01-9206-CR-00196, 1993 WL 247907, at *4 (Tenn. Crim. App. July 8, 1993)).

This court reviews a trial court's decision regarding severance for an abuse of discretion. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008). "Reversal is required only when the record demonstrates that the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." *State v. Carruthers*, 35 S.W.3d 516, 553 (Tenn. 2000) (citations and quotation marks omitted).

Here, the trial court did not abuse its discretion by ordering that Defendants' cases be tried together. Defendants were indicted in a single indictment for the same charges and were both accountable for each charge. Had the cases been tried separately, the evidence at both trials would have been the same because the charges arose from the same injuries based upon different theories of accountability.

Defendant Stepp argues that he was unfairly prejudiced because "it is obvious that the co-defendants' interests were not aligned," and the joint trial forced him to "defend his innocence from both the State and Defendant Ledford." The State's theory of the case was that Defendant Ledford was the perpetrator of the abuse, and that Defendant Stepp was guilty because he was aware of the abuse and did not stop it. Defendant Ledford presented witnesses to divert blame from her as the perpetrator, but the evidence still showed that, regardless of who abused H.I., Defendant Stepp was aware of the abuse and failed to stop it. The joint trial did not hinder Defendant Stepp's ability to argue that he was unaware of the abuse. Defendant Stepp is not entitled to relief on this issue.

Defendant Ledford argues that she "was unfairly prejudiced due to the nature of the charges" and the risk that H.I.'s testimony would be biased in favor of Defendant Stepp because he was H.I.'s biological father. As Defendant Ledford correctly notes, our supreme court has advised that "trial courts should give motions to sever serious consideration when such motions are made." *State v. Gomez*, 367 S.W.3d 237, 426 n.7 (Tenn. 2012). However, in the same case, our supreme court "decline[d] to require the severance of the trials of defendants" in child abuse cases. *Id.* Defendant Ledford presents no additional authority, and we find none, that requires severance "because of the inherent nature of child abuse cases[.]"

Next, Defendant Ledford argues that the various minor inconsistencies in H.I.'s recollection of events through the investigation and judicial process, Defendant Stepp's presence at examinations, H.I.'s affection for Defendant Stepp, and Ms. Miller's concerns about Defendant Stepp's potential interference with the investigation raised a concern that H.I.'s testimony was biased in favor of Defendant Stepp "which impacts on the truthfulness

of [H.I.]'s testimony[.]"  Because Defendant Ledford raises these issues for the first time on appeal, they are waived.  *See Hardison*, 680 S.W.3d at 309 (stating that a party "cannot raise an issue for the first time on appeal nor can they change their arguments on appeal"); Tenn. R. App. P. 36(a).  In her motions for severance, written objection to reconsolidation, and motion for new trial, Defendant Ledford asserted only that severance was warranted because Defendants' interests were not aligned and that their defenses were mutually antagonistic.

Waiver notwithstanding, Defendant Ledford fails to establish that a joint trial had any impact on H.I.'s testimony.  H.I. and multiple other witnesses testified regarding H.I.'s consistent identification of Defendant Ledford as the person who "whooped" her and Defendant Stepp's awareness of Defendant Ledford's actions.  Defendants extensively cross-examined H.I. and the other witnesses regarding H.I.'s inconsistencies.  The jury, by its guilty verdict, resolved these inconsistencies and credibility determinations in favor of the State.  *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  Defendant Ledford is not entitled to relief on this issue.

## IV.     Sufficiency of the Evidence

Both Defendants argue that the evidence was insufficient to sustain their convictions in count one because the State failed to establish serious bodily injury.  Defendant Ledford does not challenge the sufficiency of the evidence regarding her conviction in count two. Defendant Stepp also challenges both of his convictions on the grounds that the evidence was insufficient to establish that he caused the abuse or had knowledge of the abuse.  The State asserts that the evidence was sufficient.  We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e).  The standard of review is the same whether a conviction is based on direct or circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).  Further, circumstantial evidence need not remove every reasonable hypothesis except that of guilt.  *Id.* at 381 (quoting *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)).  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom."  *State v. Davis*, 354

S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659 (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

A person commits the offense of aggravated child abuse when that person commits child abuse and "[t]he act of abuse, neglect or endangerment results in serious bodily injury to the child[.]" T.C.A § 39-15-402(a). "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury" commits child abuse. *Id.* § 39-15-401(a). As relevant in this case, "serious bodily injury to the child" includes "injuries to the skin that involve severe bruising . . . including those sustained by whipping children with objects[.]" *Id.* § -402(c). Whether the child suffered "severe bruising" is a question of fact for the jury. *State v. Pence*, No. E2015-00476-CCA-R3-CD, 2016 WL 692740, at *10 (Tenn. Crim. App. Feb. 22, 2016). One is criminally responsible for the conduct of another when the person has a legal duty "to prevent commission of the offense and acting with intent to . . . promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense." T.C.A. § 39-11-402(3). Defendants were charged with aggravated child abuse in count one of the indictment "based on the severe bruising and injuries" and in count two of the indictment "based on the bruising of the eye and head contusion."

When viewed in the light most favorable to the State, the evidence showed that on January 9, 2018, H.I. arrived at school with bruises on various parts of her body. H.I. told D.S. that she got the bruises from "whippings and that she got a lot of whippings during Christmas break." D.S. initiated a DCS report, and Ms. Miller responded to the school the next day and photographed H.I.'s injuries. H.I. told Ms. Miller that Defendant Ledford "would whip her for peeing in the bed." On January 12, 2018, Dr. Perales examined H.I. Photographs taken during the examination showed large bruises on H.I.'s legs and hip, bruises on her shins, knees, and arms, and other abrasions on her stomach, back, and buttocks. Dr. Perales described multiple bruises as loop lesions and explained that those would be caused by H.I.'s being hit with a looped object such as a cord or belt. Dr. Perales

- 27 -

determined the injuries to be consistent with repeated inflicted trauma. She informed Defendant Stepp of her conclusions and advised him to protect H.I. from the perpetrator.

Regarding count one, both Defendants contend that the evidence was insufficient to establish serious bodily injury based on the bruising seen on H.I. in January 2018. Defendant Ledford specifically notes that Dr. Perales did not give a medical opinion as to whether the bruising was severe. However, Dr. Perales was clear that she did not use the term severe because it is not a medical description. Dr. Perales noted several concerning bruises and photographed each bruise. She described one of the bruises as "significant" because of its size. Dr. Perales concluded that H.I.'s injuries were caused by "repetitive inflicted trauma with a loss of control." Based on the testimony of Dr. Perales and the photographs of H.I.'s injuries exhibited to her testimony, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that H.I. suffered severe bruising resulting in serious bodily injury as charged in count one. *See Pence*, 2016 WL 692740, at *10 (concluding that the jury could have found severe bruising based on the photographs in evidence).

Defendant Stepp challenges both of his convictions, arguing that the evidence was insufficient to prove that he caused H.I.'s injuries or knew about the abuse. The State's theory of the case was that Defendant Stepp was criminally responsible for Defendant Ledford's actions because he knew of the abuse and failed to protect H.I. H.I. testified that Defendant Stepp was in the house when Defendant Ledford hit her. H.I. told Ms. Mundy that Defendant Stepp knew of Defendant Ledford's actions and did not make her stop. Further, after the January 2018 injuries, Defendant Stepp was aware that there was an ongoing DCS investigation of abuse and acknowledged Dr. Perales's conclusion that H.I.'s injuries were intentional and that he should protect H.I. from the perpetrator, who H.I. had identified in his presence as Defendant Ledford. The evidence was sufficient for the jury to find beyond a reasonable doubt that Defendant Stepp was aware of, but failed to stop, the abuse.

Defendants are not entitled to relief.

## V. Sentencing

Both Defendants argue that the trial court placed undue weight on enhancement factors to impose effective twenty-one-year sentences. Defendant Ledford requests that this court reduce her sentence to the statutory minimum of fifteen years, and Defendant Stepp requests a sentence reduction to "sixteen to seventeen years." The State argues that the trial court properly sentenced Defendants. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

Once a trial court determines the appropriate range of punishment, a trial court must consider any evidence received at trial and the sentencing hearing, the presentence report, the purposes and principles of sentencing, any argument for alternative sentencing, the nature and characteristics of the criminal conduct involved, evidence regarding enhancement and mitigating factors, statistical information provided by the administrative office of the court regarding sentencing practices for similar crimes, any statement the defendant makes on his own behalf, and the results of a validated risk and needs assessment. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed shall be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4). Because the trial court's sentencing decision was based on proper considerations, we will review it for an abuse of discretion with a presumption of reasonableness.

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *no perm. app. filed*. It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2007)), *no perm. app. filed*.

Here, the trial court imposed within-range sentences of twenty-one years for each conviction and ran the counts concurrently for an effective sentence of twenty-one years for each Defendant. *See* T.C.A. § 40-35-112(a)(1) (stating a Range I sentence for a Class A felony is between fifteen and twenty-five years). The trial court found that both Defendants had violated a position of private trust and applied enhancement factor fourteen. *See id.* § -114(14). The trial court found that Defendant Stepp's criminal history was an enhancement factor, and Defendant Ledford's lack of criminal history was a mitigating factor. *See id.* §§ -114(1); -113(13).

Defendant Stepp argues that the trial court "placed too much significance" on his criminal history and abuse of private trust. Although Defendant Stepp's criminal history may be considered minor compared to others, it is still criminal history that the trial court could properly consider. *See State v. Warren*, No. M2001-02139-CCA-R3-CD, 2003 WL 354505, at *4 (Tenn. Crim. App. Feb 14, 2003) (holding that the defendant's three prior misdemeanor convictions for passing worthless checks were sufficient to enhance his sentence). "Mere disagreement with the weight the trial court gives to properly assigned factors is not grounds for appeal." *State v. Rousseau*, No. M2023-01320-CCA-R3-CD, 2024 WL 2797436, at *6 (Tenn. Crim. App. May 31, 2024), *perm. app. denied* (Tenn. Aug. 14, 2024). The trial court did not improperly enhance Defendant Stepp's sentence. Defendant Stepp is not entitled to relief.

Defendant Ledford argues that she should have received the minimum sentence. She asserts that her lack of criminal history was a mitigating factor and that the trial court placed too much weight on her abuse of private trust because she "was only the girlfriend" of Defendant Stepp, and Defendant Stepp "was the one who was with [H.I.], whether it was going to the doctor or riding in the ambulance." First, the trial court considered Defendant Ledford's lack of criminal history in imposing her sentence, and her disagreement with the weight applied to this factor is not a ground for relief. *See Rousseau*, 2024 WL 2797436, at *6. Next, Defendant Ledford lived in the house with H.I. and was responsible for H.I.'s care when Defendant Stepp worked. As an adult who lived in the same household as H.I. and occupied a step-parental role, Defendant Ledford occupied a position of private trust. *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996) (stating that the determination of a position of trust is dependent on the nature of the relationship and that a step-parent is an "obvious" example); *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999) ("Where the adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor."). The trial court properly applied this enhancement factor. Defendant Ledford is not entitled to relief.

## VI. Cumulative Error

Defendants contend that they are entitled to relief under the cumulative error doctrine. The cumulative error doctrine recognizes that there may be many errors that are harmless in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant relief under the cumulative error doctrine, there must have been more than one actual error committed during the trial proceedings. *Id.* at 77. As we have found no error, Defendants are not entitled to relief.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.

s/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE